IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE |
| v. | ) ) | NUMBER 3:11-cv-123-TCB |
| FAYETTE COUNTY BOARD OF COMMISSIONERS, et al., | ) ) ) | |
| Defendants. | ) | |

## O R D E R

Plaintiffs, who include the Georgia State Conference of the NAACP, the Fayette County Branch of the NAACP, and individuals who are African-American registered voters residing in Fayette County, claim that Fayette County's at-large method of electing members to the Fayette County Board of Commissioners ("BOC") and Board of Education ("BOE") violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973, because the current voting scheme essentially guarantees that no African-American will be elected to either board.  As an alternative to at-large voting, Plaintiffs submit a single-

member districting plan, which they contend will provide African-Americans the opportunity to elect candidates of their choice to both boards.  The County Defendants[1] oppose Plaintiffs' proffered plan, arguing that the current election system does not violate § 2.  Before the Court are the parties' cross-motions for summary judgment [108 & 110].

## I.    Background

### A.    Legal Standard for Establishing a Violation of § 2 of the Voting Rights Act

Section 2 of the Voting Rights Act, as amended, provides that no "standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973(a).  A violation of § 2 is established "if, based on the totality of circumstances, it is shown that . . . [members of the minority group] have less opportunity than other members of the electorate to participate in the political process and to elect

---

[1] The County Defendants include Defendants Fayette County Board of Commissioners; Charles Oddo, David Barlow, Randy Ognio, Steve Brown and Allen McCarty, in their official capacities as members of the Fayette County Board of Commissioners; Fayette County Board of Elections and Voter Registration; and Tom Sawyer, in his official capacity as the department head of the Board of Elections and Voter Registration.

representatives of their choice." *Id.* § 1973(b).[2]  While explaining that

"[t]he extent to which members of a protected class have been elected to

office in the State or political subdivision is one circumstance which may be

considered" in evaluating an alleged violation, subsection (b) cautions that

"nothing in this section establishes a right to have members of a protected

class elected in numbers equal to their proportion in the population."  *Id.*

"Passage of the Voting Rights Act of 1965 was an important step in

the struggle to end discriminatory treatment of minorities who seek to

exercise one of the most fundamental rights of our citizens: the right to

---

[2] The statute provides in full:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

vote." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). The Supreme Court has "long recognized" that at-large voting schemes have the potential to "operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Id.* (internal punctuation omitted) (citing cases). "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id.*

In *Gingles*, the Court held that to establish a claim of actionable vote dilution under § 2, plaintiffs must establish three "necessary preconditions": (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive," and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51.

Once these preconditions are established, "the court considers whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams v. Johnson*, 521 U.S. 74, 91 (1997) (quoting 42 U.S.C. § 1973(b)). Judicial assessment of the totality of the circumstances requires a "searching practical evaluation of the 'past and present reality.'" *Gingles,* 478 U.S. at 45. The key to this inquiry is an examination of the seven principal factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act, the so-called "Senate factors." *Id.* at 44-45 (citing S. REP. NO. 97-417 at 28-29 (1982), 1982 U.S.C.C.A.N. 177, 206-07 (the "Senate Report")). Those factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the Democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.  if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

6.  whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7.  the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* The Senate Report adds two other considerations that may have

probative value in vote-dilution cases, specifically:

1.  whether there is a significant lack of responsiveness on the part of the elected officials to the particularized needs of the members of the minority group; and

2.  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* The list of factors is "neither comprehensive nor exclusive."  *Id.*

Plaintiffs need not prove a majority of these factors, nor even any particular

number of them in order to sustain their claims.  Instead, "these factors are

simply guideposts in a broad-based inquiry in which district judges are

expected to roll up their sleeves and examine all aspects of the past and

6

present political environment in which the challenged electoral practice is used." *Goosby v. Hempstead, N.Y.,* 956 F. Supp. 326, 331 (E.D.N.Y. 1997).

### B.     Procedural Background

On August 9, 2011, Plaintiffs brought this action against the BOE and its members (collectively the "School Board Defendants") and the County Defendants, who include the BOC, its members,[3] the Fayette County Board of Elections and Voter Registration and its department head.[4]  Plaintiffs' sole claim is that Fayette County's at-large method of electing members to the BOC and BOE dilutes African-American voting strength, resulting in African-American voters being denied an equal opportunity to participate in the political process and elect representatives of their choice, in violation of § 2 of the Voting Rights Act.

Shortly after both sets of Defendants filed their answers, Plaintiffs and the School Board Defendants reached a settlement in this case. Subsequently, on February 20, 2012, Plaintiffs and the School Board Defendants filed a motion for approval of their proposed consent decree

[3] As of the date of this Order, the BOE members include Marion Key, Bob Todd, Leonard Presberg, Mary Kay Bacallao, and Barry Marchman.

[4] Tom Sawyer is the department head of the Fayette County Board of Elections.

and entry of final judgment.[5]   The County Defendants opposed the consent decree, arguing that the remedy to which Plaintiffs and the School Board Defendants agreed is not authorized by law.  The Court ordered the parties to brief specific issues regarding the proposed decree and scheduled a hearing on the matter.

On May 2, 2012, Plaintiffs and the School Board Defendants submitted an amended proposed consent decree.  In that consent decree, Plaintiffs and the School Board Defendants relied upon a plan that they refer to as the Illustrative Plan to fulfill *Gingles*'s first precondition that the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district."  The Illustrative Plan creates a majority-minority district with voters who report as "any part black" constituting 50.22% of voting individuals.  However, that plan was not the one the consenting parties proffered as a remedy for the alleged § 2 violation.  Instead of the Illustrative Plan, the consenting parties sought to have the Court order the County to adopt what the parties refer to as the BOE Plan.  That plan creates a district with an African-American voting-age population of only 46.2%.  The County Defendants argued that the

---

[5] The Court initially approved the consent decree, but later vacated its approval following the County Defendants' filing of their objections to the consent decree.

Illustrative Plan could not meet the first *Gingles* precondition because it constituted a racial gerrymander, and that the BOE Plan was not a permissible remedy because African-American voters did not comprise more than 50% of the voters in that district.

On May 30, 2012, the Court held a hearing in which it heard argument from all parties regarding the proposed amended consent decree. After carefully considering the issues, the Court orally denied approval of the consent decree, agreeing with the County Defendants that even if a § 2 violation was established (an issue that the Court did not reach at that time), the Court did not have the authority to impose the BOE plan as a remedy because that plan does not include a majority-minority district, i.e., a district with African-American voters constituting more than 50% of the voting age population.  Relying on the Supreme Court's decision in *Bartlett*, the Eleventh Circuit's holding in *Nipper v. Smith*, 39 F.3d 1494, 1511 (11th Cir. 1994), and the Fifth Circuit's decision in *Fairley v. Hattiesburg, Mississippi*, 584 F.3d 660, 668 n.3 (5th Cir. 2009), the Court held that the

amended consent decree was not a permissible remedy under § 2 because it fails to create a majority-minority district.[6]

Following the Court's denial of the motion to approve the amended consent decree, Plaintiffs and the County Defendants proceeded to discovery and subsequently filed the present cross-motions for summary judgment. The School Board Defendants, having conceded the existence of a § 2 violation, did not participate in discovery or the current motions.

## C.   Facts

Fayette County is located in Northwest Georgia, just south of Atlanta. According to the 2010 decennial census, upon which both parties have relied, the population of the county is 106,567. Of that number, 75,802 (71.1%) residents are white, and 21,395 (20.1%) are African-American. The voting-age population is 78,468, with 57,766 (73.6%) voters identifying as white, and 15,247 (19.5%) as African-American.

The African-American population is largely concentrated in the northern half of the county. The city of Fayetteville, which is in the

---

[6] Following the Court's decision denying the consenting parties' motion to approve the consent decree, Plaintiffs filed a motion to certify an interlocutory appeal to the Eleventh Circuit. Because there is no substantial ground for a difference of opinion on the issue, the Court denied Plaintiffs' motion.

northeast portion of the county, is one-fourth African-American.  Tyrone, located on the northwest border of the county, is one-third African-American.

The BOE and BOC in Fayette County are each comprised of five members who each serve four-year staggered terms.  The current system of electing both school board members and county commissioners is at-large voting.  For purposes of electing BOE and BOC members, the county is divided into five districts; each individual member must reside in the district from which he or she is elected.  For both boards, primaries are held to determine which candidates qualify for the general election.  The top primary finishers then advance to the general election.  In order to win the general election, a candidate must receive a majority of the votes.  If no candidate receives a majority, the top two vote-getters participate in a run-off.

On March 15, 2012, a Fayette County citizen sued the County Defendants, claiming that following the 2010 census, the districts in Fayette County are constitutionally malapportioned under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. *Lindsey v. Fayette Cnty. Bd. of Comm'rs*, No. 3:12-cv-40-TCB (N.D. Ga.

2012).  The parties quickly settled the suit, and twelve days after the complaint was filed the Court approved a consent decree setting forth a new districting plan for Fayette County BOC elections (hereinafter "the Commissioners' Plan").  Under the Commissioners' Plan, District 5, with an African-American voting-age population of 44.75%, has the heaviest concentration of African-American voters.

In Georgia, only a small minority of districts continue to use at-large elections to elect all school board members: of the 180 school districts in the state, Fayette County is one of twenty districts with completely at-large elections for all board members.  Despite politically cohesive voting by African-Americans in BOE elections, none of the five African-American candidates that have run for BOE seats has been elected.  For example, in 2010, Laura Burgess, an African-American Democrat, and Sam Tolbert, a white Republican, ran for the same position on the BOE.  Tolbert won with 68.4% of the vote even though Burgess was the clear choice among African-American voters.

African-American voters are also politically cohesive in BOC elections; however, no African-American candidate has ever been elected to that board either.  A total of seven African-American candidates have

campaigned unsuccessfully for seats on the BOC.  In 2006, Rod Mack, an African-American Democrat, ran against Jack Smith, a white Republican, for the District 4 seat on the BOC.  Although Mack was the clear choice of African-American voters, securing 99% of their votes, Smith won the seat with 69.4% of the overall vote.  That same year, the County also held a special election for the BOC to fill a vacancy.  Three Republican candidates ran for the seat, including two African-American candidates and one white candidate.  One of the African-American candidates, Emory Wilkerson, was an attorney and then vice-chairman of the Fayette County Republican party, and the other African-American candidate, Malcolm Hughes, was a certified public accountant.  The white Republican candidate, Robert Horgan, was a mechanic.  Two African-American Democratic candidates also ran: Wendi Felton, a small business owner, and Charles Rousseau, the assistant director of design and planning for Fulton County Parks and Recreation.  Despite Rousseau being the preferred candidate by African-Americans voters, having received 29.3% of the African-American vote, he only received 2% support from non-African-American voters.  The white candidate defeated all four African-American candidates, winning 51.7% of the vote.  No African-American candidate has run for the BOC since 2006.

Only one African-American has ever been elected to a countywide office in Fayette County: Magistrate Judge Charles Floyd.  In 2011, the Fayetteville City Council elected its first African-American council member, Ed Johnson, who is a former president of the local NAACP chapter.

Since 1993, various Fayette County citizens have publicly advocated for district voting.  In 2005, State Representative Virgil Fludd sponsored a bill in the General Assembly to divide Fayette County into five single-member districts with one commissioner being elected from each district. The BOC opposed the bill, and the General Assembly rejected its introduction in the 2005 session.

For purposes of this lawsuit, Plaintiffs engaged an expert, William Cooper,[7] to develop a single-member districting plan for the BOE and BOC. Cooper drew several plans, including the Illustrative Plan.  Like the Commissioners' Plan, the Illustrative Plan, which Plaintiffs rely on to support their argument that they have satisfied the first *Gingles* precondition, has five districts.  The district lines in the Illustrative Plan,

---

[7] Cooper has a B.A. degree in economics from Davidson College.  He has testified at trial as an expert witness on redistricting and demographics in federal courts in thirty-four voting rights cases.  Since the release of the 2010 census, he has developed several statewide legislative plans, including plans for Georgia, and has developed sixty local redistricting plans, primarily for groups working to protect minority rights.

however, differ from the Commissioners' Plan.  Most importantly, District

5, which has an African-American voting-age population of 44.57% under

the Commissioners' Plan, has a voting-age population of 50.22% African-

Americans under the Illustrative Plan.  The Illustrative Plan, along with

Cooper's testimony and the testimony of the County Defendants' expert

John Morgan,[8] is discussed in more detail below.

### D.    Parties' Motions for Summary Judgment

In their motion for summary judgment, the County Defendants argue

that the Illustrative Plan does not meet the first *Gingles* prong because it is

a racial gerrymander.  Additionally, the County Defendants contend that

Plaintiffs fail to establish the first prong because they have not shown that

the African-American community in Fayette County is geographically

compact.

Plaintiffs argue in their motion for summary judgment that they have

met all three *Gingles* preconditions and have established that under the

totality of the circumstances, African-American residents have less

opportunity than other members of the electorate to participate in the

---

[8] Morgan holds a B.A. degree in history from the University of Chicago.  He has worked on statewide congressional as well as local redistricting plans, and has designed plans following the 1990, 2000 and 2010 censuses.

political process and elect members of their choice to the BOE and BOC. The County Defendants concede that Plaintiffs have established the second and third *Gingles* preconditions, but maintain that Plaintiffs have not shown the first *Gingles* prong.  Further, the County Defendants contend that Plaintiffs have failed to satisfy the totality-of-the-circumstances test.

## II.   Legal Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.*  Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v.*

16

*Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party would have the burden of proof at trial, that party "must show *affirmatively* the absence of a genuine issue of material fact: it 'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'"  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 331).  "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'"  *Id.* (quoting *Celotex*, 477 U.S. at 331).

However, where the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden.  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991).  The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.* at 1438 (citing *Celotex*, 477 U.S. at 324).  The second is to show that "there is an absence of evidence to support the nonmoving party's case."  *Id.* (quoting *Celotex*, 477 U.S. at 323).  If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to

show that a genuine issue remains for trial.  *Id.*  At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting *Celotex*, 477 U.S. at 324).

## III.   Discussion

### A.    The First *Gingles* Precondition

The first *Gingles* precondition requires Plaintiffs to show that the African-American population is "sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  This precondition is a practical requirement, posing the threshold inquiry of whether a remedy is available; "unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."  *Id.* at n.17; *see also Nipper*, 39 F.3d at 1530-31. Stated another way, the plaintiff in a § 2 case must demonstrate that if a violation is found, a remedy can be imposed.  Here, unless the African-

American population is large and compact enough to form a single majority-African-American district, there is no feasible remedy.

The County Defendants contend that Plaintiffs face two insurmountable obstacles to establishing the first prong of their claim: (1) Plaintiffs have failed to proffer evidence that the African-American community in Fayette County is geographically compact; and (2) the Illustrative Plan is not a viable remedy because it was created as a result of racial gerrymandering, i.e., it violates the Equal Protection Clause of the Fourteenth Amendment because race was Cooper's predominant concern in designing the plan.

Plaintiffs argue that they have offered proof that as a matter of law Fayette County's African-American community satisfies the first *Gingles* precondition because the minority population is sufficiently large and geographically compact.  Further, they argue that the Illustrative Plan is not a racial gerrymander because in creating the plan, Cooper followed traditional redistricting principles, carefully considering non-racial factors in addition to race.

### 1.    Sufficiently Large

The Court first turns to the issue of whether the African-American population is sufficiently large to constitute a majority in a single-member district.  In determining this question, the Eleventh Circuit uses the voting-age population as the relevant criterion, as opposed to overall population.  *See, e.g.*, *Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1018 (11th Cir. 1990).  Although the County Defendants do not directly challenge District 5's African-American voting-age population of 50.22% as insufficiently large,[9] they point out that it barely meets the 50% threshold by approximately thirty-five voters.  To be clear, 50.22% is sufficient to show that the minority voting-age population is sufficiently large.

In *Bartlett v. Strickland*, 556 U.S. at 6, the Supreme Court considered whether § 2 "can be invoked to require state officials to draw election-district lines to allow a racial minority to join with other voters to elect the minority's candidate of choice, even where the racial minority is less than

---

[9] In their motion for summary judgment, the County Defendants do not dispute that the African-American voting-age population is sufficiently large.  However, in their motion in opposition to the School Board Defendants and Plaintiffs' amended consent decree, the County Defendants argued that 50.22% was essentially too close to 50% to be sufficient because the disqualification of a few voters could result in a percentage below the threshold amount.  At the hearing regarding the consent decree, the Court rejected this argument.

50 percent of the voting-age population in the district to be drawn." In considering this issue, the Court explained that "the majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area? That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2." *Id.* at 18. Thus, *Bartlett* holds that a bright-line 50% rule applies to this inquiry. *See also Pope v. Cnty. of Albany,* 687 F.3d 565, 575 (2d Cir. 2012) ("[T]he first *Gingles* factor can be satisfied by showing that an identified minority group forms a simple majority of the relevant population of a proposed district."); *Bone Shirt v. Hazeltine,* 461 F.3d 1011, 1019 (8th Cir. 2006) (rejecting need to show "super-majority status"); *Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, 852-53 (5th Cir. 1999) (utilizing a 50% bright-line rule); *Cousin v. Sundquist,* 145 F.3d 818, 828-29 (6th Cir. 1998) (same); *Parker v. Ohio,* 263 F. Supp. 2d 1100, 1104-05 (S.D. Ohio 2003) (same), *aff'd mem.,* 540 U.S. 1013 (2003). Accordingly, the 50.22% African-American voting-age population in District 5 of the Illustrative Plan is sufficiently large to constitute a majority in a single-member district.

### 2.    Compactness

The County Defendants do, however, directly challenge Plaintiffs'
contention that the compactness requirement is met.  They contend that
although Plaintiffs' expert opined as to the compactness of District 5,
Plaintiffs have offered no evidence that the African-American population in
Fayette County is compact, which is what is required under *Gingles*.
Additionally, the County Defendants argue that the Illustrative Plan cannot
satisfy the first *Gingles* precondition because race was the predominant
consideration in creating the plan.

As an initial matter, the Court addresses the County Defendants'
argument that Plaintiffs' proposed district must be rejected under the first
prong of *Gingles* because it constitutes a racial gerrymander.  The County
Defendants contend that pursuant to the Eleventh Circuit's decision in
*Nipper*, 39 F.3d at 1511, Plaintiffs must show that the Illustrative Plan is a
permissible remedy in that it does not violate the Equal Protection Clause.
Pursuant to their reasoning, Plaintiffs cannot satisfy the first *Gingles*
precondition because Cooper's predominant consideration in designing the
Illustrative Plan was race.

22

The first problem with the County Defendants' argument is that they assume that if race was Cooper's primary consideration in crafting the Illustrative Plan, the plan automatically fails as a racial gerrymander under the Equal Protection Clause. This argument ignores the applicable framework of an equal-protection claim. Upon a finding that a plan "subordinate[s] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), the district is not simply rejected as a racial gerrymander. Instead, the court applies strict scrutiny to determine if the plan pursues a compelling state interest and is narrowly tailored to achieve that interest. *Shaw v. Hunt*, 517 U.S. 899, 905 (1996); *Bush v. Vera*, 517 U.S. 952, 993-34 (1996) (O'Connor, J., concurring) ("Only if traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race does strict scrutiny apply.").[10]

---

[10] Notably, as explained by a plurality of the Supreme Court in *Vera*, 517 U.S. at 958, strict scrutiny does not apply merely because redistricting is performed with consciousness of race, and does not apply to all cases of intentional creation of majority-minority districts. For example, in *DeWitt v. Wilson*, 856 F. Supp. 1409, 1413 (E.D. Cal. 1994), *summarily aff'd*, 515 U.S. 1170 (1995), the court held that California's redistricting plan did not constitute racial gerrymandering, and thus strict scrutiny did

In *Shaw*, as well as *Vera*, the Court assumed that compliance with § 2 can constitute a compelling state interest.  The Court warned, however, that "the district drawn in order to satisfy § 2 must not subordinate traditional redistricting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability."  *Vera*, 517 U.S. at 979.  As for narrow tailoring, the Court explained, "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district."  *Id.* at 977.  The Court further observed that "[a] § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests.'"  *Id.* at 977.  Thus, contrary to the County Defendants' contention, it is possible that a district created to comply with § 2 that uses race as the predominant factor in drawing district lines may survive strict scrutiny.  *See Reed v. Town of Babylon*, 914 F.

---

not apply because the plan "created majority-minority districts in a manner that was consistent with traditional redistricting principles, not based solely on race, and not involving extremely irregular district boundaries."  Similarly, in *Robertson v. Bartels*, 148 F. Supp. 2d 443, 455 (D.N.J. 2001), the plaintiffs failed to support a claim for racial gerrymandering subject to strict scrutiny where the plan at issue "considered traditional redistricting principles as well as the requirements of the Voting Rights Act."

Supp. 843, 871 (E.D.N.Y. 1996) (Section 2 plaintiffs "must, in order to meet their burden of proof under the first *Gingles* precondition, either proffer a districting plan which does not subordinate racial considerations to traditional districting principles, including compactness, contiguity, conformance with geographic boundaries and respect for political subdivisions or communities, *or justify the need for such subordination*.") (emphasis added).

Indeed, at least one court has found that a district drawn on predominantly racial lines was nevertheless constitutional.  *See King v. State Bd. of Elections*, 979 F. Supp. 619, 626 (N.D. Ill. 1997), *summarily aff'd*, 522 U.S. 1087 (1998) (although racial considerations predominated configuration of district at issue, district survived strict scrutiny because it "remedied the anticipated § 2 violation by preserving the Latino community's voting strength through vote consolidation").  Determination of whether race was the predominant factor in designing the proposed districts is only the beginning, not the totality, of an equal-protection inquiry, as the County Defendants maintain.

The second problem with the County Defendants' argument is that it would have the Court collapse an equal-protection inquiry into the first

*Gingles* prong and hold that if the Illustrative Plan fails under the Equal Protection Clause, it is not a permissible remedy.  However, even if the Illustrative Plan was drawn predominantly on racial lines (which, as explained *infra*, the Court holds it was not), to determine whether it passes strict scrutiny, the court must know whether the district is necessary to avoid § 2 liability.  Otherwise, the court cannot evaluate whether a plan drawn primarily along racial lines is nonetheless permissible because it does not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability."  *Vera*, 517 U.S. at 979.  In other words, the court must first determine whether *Gingles* is met before ensuring that the proposed remedy complies with the Equal Protection Clause.  *Cf. Reed*, 914 F. Supp. at 871 (explaining that even if a § 2 violation was found, plaintiffs' plan was unlikely to survive a strict-scrutiny analysis in an Equal Protection Clause challenge).

An additional hurdle for the County Defendants' proffered framework is the Eleventh Circuit's decision in *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998).  There, the district court applied *Miller*, 515 U.S. at 917, to hold that the § 2 plaintiff's proposed remedy "subordinated traditional redistricting criteria to race and therefore that strict scrutiny should apply."  *Id.* at 1424.

Further, the district court concluded that the plaintiff could not satisfy the first *Gingles* factor and thus could not point to a compelling state interest to justify her plan.  Consequently, according to the district court, the plaintiff's proposal would be unconstitutional under the Equal Protection Clause.  The Eleventh Circuit held, however, that the district court had "misread the applicable law."  *Id.* at 1425.  The Eleventh Circuit explained that "[t]he district court's attempt to apply authorities such as *Miller* to th[e] Section Two case, however, [was] unpersuasive, because the *Miller* and *Gingles/Nipper/ SCLC*[11] lines address very different contexts."  *Id.*  Further, the Supreme Court and the Eleventh Circuit's "precedents *require* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate."  *Id.*  Accordingly, "[t]o penalize [the plaintiff], as the district court [did], for attempting to make the very showing that *Gingles, Nipper*, and *SCLC* demand would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action."  *Id.*; *see also Clark v. Calhoun Cnty., Miss.,* 88 F.3d 1393,

---

[11] In *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) ("*SCLC*"), the court applied *Nipper* to a § 2 challenge to at-large elections of Alabama trial judges.

1407-08 (5th Cir. 1996) (holding that "[r]edistricting to remedy found

violations of § 2 of the Voting Rights Act by definition employs race" and

declining to decide whether a district plan that would enable a group of

plaintiffs to state a claim under the Equal Protection Clause would

necessarily "flunk" the *Gingles* compactness test); *Sanchez v. Colorado,* 97

F.3d 1303, 1327 (10th Cir. 1996) ("adherence to *Gingles* to remedy

violations of § 2 necessarily implicates race").  The Court therefore declines

the County Defendants' invitation[12] to require Plaintiffs to show compliance

with *Miller* in order to meet the first *Gingles* prong, i.e., the Court will not

determine as part of the first *Gingles* inquiry whether Plaintiffs' Illustrative

Plan subordinates traditional redistricting principles to race.

  In doing so, the Court recognizes that the relevant inquiry—whether

the district was designed "consistent with traditional districting

principles"—necessarily relates to the question of whether race was the

predominant consideration.  After all, if the proposed plan disregards

---

[12] The Court is mindful of the fact that "Congress has handed to the courts the task of interpreting and applying a law which appears deceptively simple" but "is exasperatingly complex, requiring application of principles and concepts drawn from disciplines foreign to most judges." *Sanchez*, 97 F.3d at 1326.  Accordingly, "criticism is not to be leveled at anyone who conscientiously attempts to come to grips with the monumental and salutary task given to us." *Id.*; *see also Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1035 (11th Cir. 1990) ("[T]he story of section 2 is long, complex, and full of traps for the unwary.").

traditional redistricting principles, it is likely that these principles were disregarded in favor of race, rendering the district non-compact. *See, e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 435 (2006) ("*LULAC*") (rejecting as non-compact plan that failed to consider communities of interest, communities were separated by "enormous geographical distance," and "only common index [was] race"); *Reed*, 914 F. Supp. 843, 870-73 (plaintiffs' plan, which was "devised with so little attention to traditional districting criteria and with race as the near-sole consideration" failed the first prong of *Gingles* and would be unlikely to survive strict scrutiny in an equal protection challenge).  While this may be true, the question under the first prong of *Gingles* in a § 2 case of whether the district was created "consistent with traditional districting principles" is distinct from *Miller*'s question of whether in drawing district lines traditional districting principles were "subordinated to racial objectives." *Davis*, 139 F.3d at 1425.  Based on the directives of the Supreme Court and the Eleventh Circuit, the Court considers only the first question here.

Plaintiffs argue in their brief in support of their motion for summary judgment that District 5 in the Illustrative Plan is compact because it is "geographically compact" and complies with traditional redistricting

29

principles.  Before evaluating the compactness of District 5, it is necessary to define "compactness" under § 2.

"Within the Supreme Court's voting rights jurisprudence, the word 'compactness' refers to two distinct concepts." *Fletcher v. Lamone*, 831 F. Supp. 2d 887, 899 (D. Md. 2011); *see also* Joshua Drew, *Snapshots from the Jurisprudential Wilderness; the Federal Courts' Understanding of the Equal Protection Clause in the Voting Rights Arena*, 5 VA. J. SOC. POL'Y & L. 373, 416-17 (1998) (discussing the differences between the two compactness inquiries).  "In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines." *LULAC*, 548 U.S. at 433 (citing *Miller,* 515 U.S. at 916-17).  Section 2 compactness, by contrast, "refers to the compactness of the minority population, not to the compactness of the contested district." *Id.* (quoting *Bush v. Vera,* 517 U.S. at 997 (Kennedy, J., concurring)); *see also Houston v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) ("The district court should have focused on the size and *concentration* of the minority population, rather than only on the shape of the districts in the plaintiff residents' specific proposals."); *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1465 (M.D. Ala. 1988)

("By compactness, *[Gingles]* does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness.").

*LULAC* instructs that "while no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries."'" 548 U.S. at 433 (citing *Abrams*, 521 U.S. at 92). Other traditional redistricting principles include geographical compactness, contiguity, and protection of incumbents. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1325 (N.D. Ga. 2004). Thus, while Plaintiffs' evidence regarding the geographical compactness of their proposed district does not alone establish compactness under § 2, that evidence, combined with their evidence that the district complies with other traditional redistricting principles, is directly relevant to determining whether the district is compact under § 2.

The Court therefore considers whether District 5 of the Illustrative Plan is compact, i.e., whether it was designed "consistent with traditional districting principles." *Davis*, 139 F.3d at 1425; *see also United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 420 (S.D.N.Y. 2010) ("To

demonstrate the existence of the first *Gingles* precondition in an at-large system, the Plaintiffs must be able to draw illustrative single-member districts following traditional districting principles to show that the [minority] population is sufficiently large and compact so as to constitute a majority in a single-member district."). After carefully considering the parties' arguments, the Court concludes that the district is reasonably compact.

First, Plaintiffs have shown that District 5 is geographically compact. To illustrate the district's compactness, Cooper applied the Reock test, which compares the area in each district to a circle and assigns a value between zero and one with one being the most compact. Cooper determined that the mean score for the five districts in the Illustrative Plan is .42, with District 5 having a score of .31. Cooper testified that these scores compare favorably with the Commissioners' Plan. Cooper further testified that under the Reock test the Illustrative Plan is well within the norm for districts across many state and local redistricting plans and is as compact or more compact than twenty-three county school board and county commission districting plans from a sample of twenty-five Georgia

counties.  Further, according to Cooper, the plan is more compact than twenty-five percent of Georgia state legislative districts.[13]

Nevertheless, the County Defendants contend that the Illustrative Plan is not compact.  In support of their contention, they first rely on their expert Morgan's testimony that when applying the Reock test and the Polsby-Popper test, which is a perimeter measure that considers how efficiently the area of a district is encompassed by its perimeter and boundary, District 5 is the least compact district in the Illustrative Plan. Additionally, they point to Cooper's concession that the number of state legislative districts that scored the same or lower than the compactness of District 5 was less than 86 out of 908.  Finally, they make much of Cooper's statement that District 5 is "not going to win a blue ribbon for compactness."

But the County Defendants cite no authority that Plaintiffs bear the burden of designing a district that is compact under multiple tests or is more compact than a majority of other districts, i.e., that the district need

---

[13] Cooper also testified that District 5 of the Illustrative Plan is as compact or more compact than 87 out of 294 lower house legislative districts drawn by the County Defendants' expert Morgan in New Mexico, South Carolina and Virginia.

33

be blue-ribbon-worthy.[14] [15]  In light of this and the fact that "[u]nfortunately, there is no litmus test for compactness; it has been described as 'such a hazy and ill-defined concept that it seems impossible to apply it in any rigorous sense,'" *Johnson v. Miller*, 864 F. Supp. 1354, 1388 (S.D. Ga. 1994), the Court concludes that the County Defendants have failed to show that Plaintiffs' proffered plan is not reasonably compact.

The County Defendants also argue that the shape of District 5 is "unusual" in that there are two clumps protruding from either side of the district.  The Fifth Circuit has explained that "[a]s the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question, it is clear that shape is a significant factor that courts can and

---

[14] The Court is aware of only one case that has examined the Reock test in conjunction with the Polsby-Popper measure.  In *Committee for a Fair & Balanced Map v. Illinois State Board of Elections*, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011), the court rejected as non-compact a district with a Reock score of 0.30 and Polsby-Popper score of .05 because the district failed the "eyeball test" and the defendant's expert had testified that "low compactness is equal to or less than .05 on the Polsby-Popper measure and equal or less than .15 on the Reock measure."  Here, the Reock and Polsby-Popper scores, 0.31 and 0.16 respectively, are above the scores identified as reflecting low compactness in *Committee for a Fair & Balanced Map*.

[15] In *Vera*, 517 U.S. at 977, the Court explained, "A § 2 district that is *reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed by plaintiffs' experts in endless 'beauty contests.'"  Thus, if District 5 is reasonably compact, it could satisfy strict scrutiny despite the fact that other districts are arguably more compact.

must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004).  In *Sensley*, the court rejected a proposed district as non-compact where the new district was the result of "two areas of highly-concentrated African-American population, which [were] roughly 15 miles apart from one another, [being] linked together by a narrow corridor of land." *Id.*  Here, in contrast to the district in *Sensley*, the African-American population is dispersed throughout the northern half of the county, the cities of Fayetteville and Tyrone are separated by only 3.5 miles, and the two protrusions (one in Tyrone and one in Fayetteville) are linked together by much more than a mere narrow corridor of land. Although Morgan characterized the African-American population as being in three distinct population centers—the Kenwood, Europe and Blackrock areas; the City of Tyrone; and the City of Fayetteville—it is undisputed that these areas are all in the northern half of the county.  While District 5 reaches out to grab a pocket of African-American population in Tyrone and then another pocket in Fayetteville, those pockets are not "small and apparently isolated minority communities." *Vera*, 517 U.S. at 977-79. Instead, those areas are geographically close to the area in which the African-American population is generally concentrated.  *Cf. Benavidez v.*

*City of Irving, Tex.*, 638 F. Supp. 2d 709, 722 (N.D. Tex. 2009) (even though illustrative district "'reach[ed] out to grab' pockets of Hispanic population" it was compact because "the heavily Hispanic Census blocks [were], in fact, geographically very close of the nucleus of Hispanic concentration in south Irving").

Importantly, Plaintiffs' evidence demonstrates that District 5 includes a community of interest.  In *Vera*, 517 U.S at 964, the Court set forth examples of "manifestations of [a] community of interest"; these include "shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches."  Cooper testified in his deposition that he took into account the "perceived unity of the African-American community in the cities of Fayetteville and Tyrone and the Kenwood, Europe areas."  Further, various Plaintiffs testified in their depositions that residents in North Fayette County share common places of worship and recreation, are members of the North Fayette Community Association, and participate in fraternity and sorority events.[16]  Residents in

---

[16] Lowry testified in his deposition that the two cities have shared schools, Tyrone residents go to churches in North Fayette, and people from Tyrone are members of the NAACP and North Fayette Community Association.  Alice Jones testified in her deposition that residents in North Fayette County share schools and attend NAACP meetings.  And Ali and Aisha Abdur-Rahman both testified in their depositions that citizens of Tyrone and Fayetteville attend a mosque in Fayetteville.

District 5 also "share common socioeconomic and political concerns." *Cane v. Worcester Cnty., Md.*, 35 F.3d 921, 927 n.6 (4th Cir. 1994) (district that included citizens who shared common socioeconomic and political concerns followed traditional redistricting principle of drawing districts consistent with common interests).  It is also worth noting that from outer city limits to outer city limits, Fayetteville and Tyrone are roughly 3.5 miles apart, in stark comparison to the 300-mile gap, an "enormous geographical distance," that separated the two Hispanic communities in *LULAC*, 548 U.S. at 435.[17]

    While the court "may not accept bare assertions that the area's African-American residents share the same characteristics, needs, and interests," *Fletcher*, 831 F. Supp. 2d. at 899, Plaintiffs have offered more than bare assertions in support of their contention that the African-Americans in District 5 form a community of interest.  Thus, rather than

---

[17] In *Abrams*, 521 U.S. at 100, the Court explained that "Georgia has an unusually high number of counties: 159, the greatest number of any State in the Union apart from the much-larger Texas.  These small counties represent communities of interest to a much greater degree than is common . . . ."  Although *Abrams* dealt with a state-wide redistricting plan for congressional elections, based on its conclusion that due to the small size of Georgia's counties the counties themselves constitute communities of interest, the Court finds unpersuasive the County Defendants' argument that District 5 divides communities simply because it splits two municipalities that are a mere 3.5 miles apart.  This is especially true in light of the fact that the County Defendants have offered no evidence that residents in Tyrone and Fayetteville have disparate interests.

merely "assum[ing] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidate at the polls," *LULAC*, 548 U.S. at 433,[18] the evidence demonstrates that District 5 includes a community of interest, and the County Defendants have not shown that the district includes diverse interests that "are so significant that plaintiffs' proposed district could not be effectively represented," *Clark*, 21 F.3d at 96.[19]

The County Defendants attempt to attack Plaintiffs' evidence by arguing that (1) Cooper admitted that he was unaware of the location or attendance patterns for any churches or civic organizations besides the NAACP when he drew the Illustrative Plan, (2) Cooper ignored municipal boundaries, (3) the Illustrative Plan did not follow school attendance zones, and (4) Morgan testified that there are three concentrations of African-Americans in Fayette County.  First, the County Defendants misconstrue Cooper's testimony.  While Cooper could not name specific churches, he

---

[18] In contrast to *LULAC*, rather than assuming that the African-Americans in District 5 will prefer the same candidate, the evidence conclusively establishes that African-Americans throughout Fayette County are politically cohesive.

[19] In her dissent in *Miller*, 515 U.S. at 919-20, 944, Justice Ginsburg pointed out that "ethnicity itself can tie people together" and is a "significant force in political life." Here, in addition to their cohesive voting patterns, shared religious and community activities and schools, and close geographical proximity to each other, African-American voters' ethnicity is yet another characteristic uniting them as a community of interest.

testified that he had been informed that there were common interests between Tyrone and Fayetteville when he designed the Illustrative Plan. Second, Cooper never testified that he ignored municipal boundaries. While the Illustrative Plan does split Fayetteville and Tyrone, it appears from the Commissioners' Plan that that plan also splits those municipalities.  Further, "simply because district lines may be drawn to maintain the integrity of political subdivisions does not mean that a proposed majority-minority district that would divide municipalities fails to comply with traditional districting principles" where the plan complies with other redistricting principles.  *Cane*, 35 F.3d at 927 n.6 (internal punctuation and citation omitted); *see also Clark*, 21 F.3d at 96 (splitting of three municipalities did not render district non-compact unless diverse interests of municipalities were "so significant that plaintiffs' proposed district could not be effectively represented").  As to school zones, Cooper testified that he considered them but did not draw district lines according to the zones because the zones often change.[20]  Finally, although Morgan testified that the African-Americans in Tyrone and Fayetteville constitute

---

[20] The County Defendants criticize Cooper's failure to draw the Illustrative Plan consistent with school zones.  Notably, a comparison of the high school attendance area and elementary school attendance areas shows that the Commissioners' Plan does not follow school zones either.

two separate concentrations of the African-American population, he did not

indicate that these were two distinct communities with different interests

or political beliefs.  In essence, none of the County Defendants' arguments

shows that the residents of District 5 have "disparate needs and interests,"

*LULAC*, 548 U.S. at 435, or that the plan "includes in one district

individuals who belong to the same race, but who are otherwise widely

separated by geographical and political boundaries, and who may have little

in common with one another but the color of their skin," *Shaw*, 509 U.S. at

647.

Next, in drawing the Illustrative Plan Cooper ensured that the

population deviation was within the 10% norm for redistricting.  The

Illustrative Plan has a population deviation of 5.69%.  Although it is higher

than the Commissioners' Plan, which is 4.03%, it is still comfortably within

the accepted 10% for state or local legislature districting purposes.  *Brown*

*v. Thomson,* 462 U.S. 835, 842-43 (1983); *White v. Regester,* 412 U.S. 755,

764 (1973).  The County Defendants, however, contend that this Court in

*Larios*, 300 F. Supp. 2d at 1340-41, made clear that there is no 10% "safe

harbor" for population equality.  The County Defendants' reliance on

*Larios* in misplaced.  There, this Court indeed explained that 10% is not a

40

safe harbor when a plan is challenged based on an alleged violation of the one person, one vote principle. Nonetheless, this Court clarified that a plan with a population deviation that is under 10% is "presumptively constitutional, and the burden [in a one person, one vote challenge] lies on the plaintiffs to rebut that presumption." *Id.* at 1341. Thus, *Larios* in no way mandates that plaintiffs in a § 2 case bear a greater burden than simply presenting a plan with a population deviation under 10%. *Cf. Vill. of Port Chester*, 704 F. Supp. 2d at 421 (plan with population deviation of 5.71% was acceptable in § 2 case); *Reed*, 914 F. Supp. at 869 (section 2 plaintiffs only needed to establish that population deviation was within 10%).

Finally, the County Defendants contend that Cooper impermissibly split eleven voting precincts. The Court disagrees. First, Cooper explained that two precincts were split in order to protect incumbents, which is another redistricting principle. Second, he balanced the splitting of precincts with achieving an acceptable population deviation. Third, the Illustrative Plan splits only four more precincts than the Commissioners' Plan. And importantly, "election precincts are not such important political boundaries that they should negate a districting proposal, particularly

where, as here, other key districting principles were obeyed." *Vill. of Port Chester*, 704 F. Supp. 2d at 439.

Plaintiffs have therefore shown that although Cooper certainly took race into consideration when creating the Illustrative Plan, he did not do so at the expense of other redistricting principles. In fact, Cooper testified that had he relied solely on race, he could have drawn a district with a 53.58% African-American voting-age population. However, taking other redistricting principles into account, including achieving a low population deviation, joining a community of interest, geographical compactness, and protecting incumbents, he was able to achieve a district that has a voting-age African-American population of 50.22%.[21] While this may be a bare majority, it is a majority. In sum, because Plaintiffs have shown that the African-American voting-age population is sufficiently large and geographically compact to constitute a majority-minority district in Fayette County, they have met the first prong of *Gingles*.

---

[21] Having determined that District 5 is "reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries" under *Gingles*, the Court finds that race was not Cooper's predominant consideration in designing the plan. However, even if race had been Cooper's primary consideration, the Court finds that the Illustrative Plan would survive strict scrutiny because it does not "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid § 2 liability." *Vera*, 517 U.S. at 977.

B.      The Second and Third *Gingles* Preconditions

The County Defendants concede that the second and third *Gingles* preconditions are met.  Thus, it is undisputed that Fayette County's African-American population is politically cohesive and that its elections are characterized by racially polarized bloc voting.

As evidence of the second and third prongs, Plaintiffs rely on the declaration of Richard Engstrom, an expert on the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice.[22]  Engstrom analyzed elections in Fayette County involving a biracial pool of candidates, including general elections, a special election and Republican primaries. He opines that "the voters' candidate preferences in [the general elections analyzed] were acutely polarized along racial lines, with African-American voters preferring the African-American candidate, and non-African-

---

[22] Engstrom is presently a visiting research fellow at the Center for the Study of Race, Ethnicity, and Gender in the social sciences department at Duke University.  He has written multiple articles related to § 2, three of which were cited with approval in *Gingles*, and has testified as an expert witness in numerous cases.

43

American voters preferring the white candidate." The result of such voting is "African-American candidates being defeated in each election."[23]

Because the County Defendants do not challenge these prongs, the Court finds that based on Engstrom's analysis and declaration, Plaintiffs have satisfied the second and third *Gingles* preconditions.

## C.    Totality of the Circumstances

Having met the three *Gingles* preconditions, Plaintiffs bear the burden of showing that the "totality of the circumstances" demonstrates vote dilution. *Johnson v. DeGrandy*, 512 U.S. 997, 1009-12 (1994); *see also Nipper*, 39 F.3d at 1524-25 ("[S]ection 2 plaintiffs must demonstrate, through the test's objective factors taken as a whole, that a voting community is driven by racial bias and that the challenged electoral scheme allows that bias to dilute the minority population's voting strength."). Courts have recognized that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of Section 2 under the totality of the

---

[23] Based upon his analysis of the Republican primaries, Engstrom concluded that while those elections "cannot inform us of who the representative of choice of African-American voters were for the offices at issue, given that so few African-Americans participated in those primaries, the choice for the nomination of the overwhelmingly non-African-American electorate in each instance was one of the white candidates."

circumstances." *NAACP v. City of Niagara Falls,* 65 F.3d 1002, 1019 n.21 (2d Cir. 1995); *see also Thompson v. Glades Cnty. Bd. of Cnty. Comm'rs,* 493 F.3d 1253, 1261 (11th Cir. 2007), *vacated on other grounds at* 508 F.3d 975; *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993).

It is important to note that while multimember districts and at-large voting schemes may "operate to minimize or cancel out the voting strength of racial minorities in the voting population," such schemes are not *per se* violative of minority voters' rights." *Gingles*, 478 U.S. at 47 (citation omitted).  Instead, "[m]inority voters who contend that the multimember form of districting violates § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates." *Id.*  To do so, § 2 plaintiffs need not prove discriminatory intent in the design or maintenance of the challenged scheme, but must at least demonstrate discriminatory effect under the results test, i.e., through application of the Senate factors. *Nipper*, 39 F.3d at 1523-24.  "These factors were designed as objective indicia that ordinarily would show whether the voting community as a whole is driven by racial bias as well as whether the contested electoral scheme allows that

bias to dilute the minority group's voting strength." *Nipper*, 39 F.3d at 1534.

### 1.    Past Discrimination and Its Lingering Effects

This factor reviews "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37.  In *United States v. Marengo County Commissioners*, 731 F.2d 1546, 1567 (11th Cir. 1984), the Eleventh Circuit observed that "past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process.  Past discrimination may cause blacks to register or vote in lower numbers than whites."

In support of this factor, Plaintiffs offer citations to Laughlin McDonald's QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990, 67-102 (Chandler Davidson & Bernard Grofman eds., 1994)[24] as evidence of Georgia's history of state-sponsored

---

[24] Plaintiffs also rely on the BOE Defendants' admission that "[t]he fact is that the at-large voting method used for our elections is most likely against the law. . . . [S]ettling this lawsuit and moving to a district voting system is the right thing to do.  For too long too many of our citizens have felt disenfranchised."  The Court agrees with the County

discrimination.  In the book, McDonald concludes that hundreds of

jurisdictions in Georgia have used at-large methods of election to minimize

the voting strength of voters of color and to ensure that minorities cannot

elect their preferred candidates of choice.  Further, according to McDonald,

in state and local elections in Georgia during the 1980s, 86% of white voters

voted for the white opponent of a black candidate.  Plaintiffs also point out

that as a result of such discrimination, Georgia is subject to § 5 of the

Voting Rights Act, requiring it to receive preclearance from the U.S.

Department of Justice or a three-judge district court panel for every voting

change it seeks to implement.  Further, as aptly explained by the court in

*Brooks v. State Board of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga.

1994):

> It is wholly unnecessary, however, to recount the voluminous
> details of Georgia's history in this Order.  The history of the
> states of segregation practice and laws at all levels has been
> rehashed so many times that the Court can all but take judicial
> notice thereof.  Generally, Georgia has a history chocked full of
> racial discrimination at all levels.  This discrimination was
> ratified into state constitutions, enacted into state statutes, and
> promulgated in state policy.  Racism and race discrimination
> were apparent and conspicuous realities, the norm rather than
> the exception.  Yet, Georgia has come a long way since the
> adoption of the Voting Rights Act of 1965 and many of the evils

---

Defendants that this statement, which says nothing about past discrimination, has little
probative value in evaluating the first Senate factor.

of Georgia's discriminatory history have been corrected. Unfortunately, some remnants remain.

The County Defendants respond that Plaintiffs have failed to point to any specific discrimination that Plaintiffs have themselves experienced in Fayette County. They argue that "[n]o Plaintiff has ever been denied the right to vote or prohibited from registering to vote or participating in the political process in Fayette County based on his or her race." First, to be clear, each of the individual Plaintiffs need not have personally experienced discrimination in order for this factor to weigh in Plaintiffs' favor. *Gingles*, 478 U.S. at 36-37, instructs that the relevant inquiry is whether discrimination has affected the rights of "the members of the minority group" in voting or participating in the political process. Certainly, those members are not restricted to the Plaintiffs in this action. Second, it is indeed noteworthy that none of the Plaintiffs has ever been denied the right to vote or has been prohibited from registering to vote, as this fact reflects substantial progress from Georgia's regrettable history of discrimination. However, this alone does not mean that African-Americans in Fayette County have not been denied the opportunity to equally participate in the political process. Whether the current at-large voting scheme affects their

48

ability to do so is discussed below in the Court's analysis of the other Senate factors.

The Court agrees with the County Defendants that in contrast to many § 2 plaintiffs, Plaintiffs have not proffered evidence relating specifically to discrimination in Fayette County. *See, e.g.*, *Marengo Cnty. Comm'rs*, 731 F.2d at 1567-68 (the historical record of discrimination in the county was "undisputed": the county school system was under judicial supervision due to the school board's opposition to desegregation; federal courts had to intervene to end discrimination in Marengo County's grand and petit juries; a long series of lawsuits was necessary to enforce the rights of African-Americans in Marengo County to vote and run as candidates; and a district court struck down a series of statutes that denied tenure to teachers in predominantly black counties including Marengo); *Windy Boy v. Cnty. of Big Horn*, 647 F. Supp. 1002, 1008 (D. Mont. 1986) (evidence was that county interfered with Native-Americans' right to register and vote and that county had appointed few Native-Americans to county boards); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161, 169 (N.D.N.C. 1984) (plaintiffs presented evidence of the lasting effects of the poll tax and literacy tests on African-Americans in the county); *Jordan v. Greenwood, Miss.*, 599 F.

Supp. 397, 400 (D.C. Miss. 1984) ("[I]t is well documented that a pattern of racial discrimination in the past has existed in Leflore County, Greenwood, and Mississippi.").

But evidence regarding the specific county's discrimination is not required; many cases hold that in challenges to a county's voting practices, evidence regarding the state's history of discrimination can tip this factor in the plaintiffs' favor. *See, e.g., Dillard v. Crenshaw Cnty.*, 649 F. Supp. 289, 294 (M.D. Ala. 1986) (recognizing that "from the late 1880's to the present the State of Alabama and its political subdivisions have 'openly and unabashedly' discriminated against their black citizens by employing at different times such devices as the poll tax, racial gerrymandering, and at-large elections . . . ."); *Sierra v. El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 807 (D.C. Tex. 1984) (focusing generally on effect of Texas's poll tax on Mexican-American voters). Thus, while evidence of discriminatory practices in Fayette County specifically would strengthen Plaintiffs' claim, based on Georgia's undisputed history of discrimination, such evidence is not required for this factor to weigh in their favor.

The County Defendants nonetheless contend that this factor weighs against Plaintiffs because Plaintiffs have not shown that the at-large system

was adopted in Fayette County due to racial discrimination or that Fayette County has purposefully discriminated against voters based on race.  The County Defendants miss the point of the totality-of-the-circumstances test and application of the Senate factors.  In *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973), the Supreme Court established a framework for plaintiffs in § 2 vote dilution cases.  *Nipper*, 39 F.3d at 1519.  To show discrimination, a plaintiff could (1) prove that "legislators or other officials intended to enact or maintain a discriminatory voting scheme," or (2) demonstrate "objective factors indicating that the minority group has less opportunity to participate in the political process and to elect officials of its choice."  *Id.*  In *City of Mobile, Alabama v. Bolden*, 446 U.S. 55, 66 (1980), the Court eliminated the second method of proof and held that § 2 plaintiffs could only succeed by proving a racially discriminatory motive on the part of legislators in designing or maintaining the disputed plan.  Congress reacted to the Court's decision in *Bolden* by codifying *White*, thereby "eliminating the absolute requirement that plaintiffs prove a discriminatory intent on the part of the legislators or officials responsible for designing or maintaining the challenged electoral scheme" and allowing plaintiffs to demonstrate a violation by proving "the

51

existence of objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group." *Nipper*, 39 F.3d at 1520. Thus, Plaintiffs need not adduce evidence that the system was adopted as a result of discrimination, nor must they show that the County has directly discriminated against them, in order for this factor to weigh in their favor.

In sum, based on Georgia's long history of discrimination, the Court finds that this factor weighs in Plaintiffs' favor. However, due to their lack of any specific evidence regarding Fayette County, such as the ongoing effects of discrimination on the African-American community, this factor does not heavily support a finding of vote dilution.

### 2.    Racially Polarized Voting

"Although no factor is indispensable, the legislative history of the amendment to section 2 indicates that racially polarized voting will ordinarily be the keystone of a dilution case." *McMillan v. Escambia Cnty., Fla.*, 748 F.2d 1037, 1043 (11th Cir. 1984); *see also Marengo Cnty. Comm'rs*, 731 F.2d at 1567 ("The surest indication of race-conscious politics is a pattern of racially polarized voting."). "Racial bloc voting is, therefore, the essence of a vote dilution claim because, to be actionable, the electoral

defeat at issue must come at the hands of a cohesive white majority."
*Nipper*, 39 F.3d at 1533.  As the above discussion of the *Gingles* third
precondition demonstrates, the evidence is that sufficient racial bloc voting
exists in Fayette County such that the white majority usually defeats
African-Americans' candidate of choice.  "In short, the evidence [Plaintiffs]
present[] creates a strong inference of racial vote dilution."  *Id.* at 1541.

    The County Defendants' only response to Plaintiffs' evidence is their
conclusory assertion that although they do not dispute that Engstrom's
analysis "appears to show racial polarization in voting," it "leaves
unanswered the question of whether the appearance of polarization is due
to politics or race."  In a footnote, they point out that "[a]s Plaintiffs
testified, most African-American voters in Fayette County vote for
Democratic candidates in a largely Republican County."  While a vote
dilution claim must fail "[w]hen the record indisputably proves that
partisan affiliation, not race, best explains the divergent voting patterns
among minority and white citizens," *LULAC v. Clements*, 999 F.2d 831, 850
(5th Cir. 1993), because the County Defendants do not offer any evidence,
or even analysis, in support of their contention that racial bloc voting could

potentially be related to politics rather than race, the Court finds that this factor weighs in favor of Plaintiffs.

### 3.   Election Practices that Enhance Discrimination

This factor considers "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.  Plaintiffs argue that the County's use of (1) numbered posts, (2) residency requirements, (3) staggered terms, and (4) a majority-vote requirement further impair African-Americans' potential for electoral success in the County.  The Court agrees that the County's manner of conducting BOE elections enhances the opportunity for discrimination and contributes to the lack of African-Americans' success in elections.

First, the County splits election of its five commissioners into individual contests.  The problem with this election device is that it eliminates the opportunity for single-shot voting.[25]  Quoting the U.S.

---

[25] The County Defendants argue that cases finding staggered terms as probative on the question of dilution discuss the requirement "as a way to defeat 'single-shot voting,' something which is not an option in Fayette County."  But that is exactly the

Commission on Civil Rights, the Court has explained single-shot voting as

follows:

> Consider [a] town of 600 whites and 400 blacks with an
> at-large election to choose four council members.  Each voter is
> able to cast four votes.  Suppose there are eight white
> candidates, with the votes of the whites split among them
> approximately equally, and one black candidate, with all the
> blacks voting for him and no one else.  The result is that each
> white candidate receives about 300 votes and the black
> candidate receives 400 votes.  The black has probably won a
> seat.  This technique is called single-shot voting.  Single-shot
> voting enables a minority group to win some at-large seats if it
> concentrates its vote behind a limited number of candidates and
> if the vote of the majority is divided among a number of
> candidates.

*City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980).  In *City of

Rome*, the Court held that the use of staggered terms affected African-

Americans' ability to elect a representative of their choice because such an

election device decreased African-Americans' ability to utilize single-shot

voting.  *See also Jackson v. Edgefield Cnty., S.C. Sch. Dist.*, 650 F. Supp.

1176, 1203 (D.S.C. 1986) (staggered terms combined with residency

requirements weigh in favor of a finding of vote dilution).

---

point: due to the use of staggered terms, as well as other requirements, African-
Americans cannot use single-shot voting, i.e., they cannot concentrate their vote on one
candidate in a large pool of candidates.

The Supreme Court has also found that the use of numbered posts enhances vote dilution by defeating single-shot voting.  In *Rogers v. Lodge,* 458 U.S. 613, 627 (1982), the Court recognized that a numbered-post requirement "enhances [the minority group's] lack of access because it prevents a cohesive political group from concentrating on a single candidate."  The Eleventh Circuit has likewise made clear that numbered posts enhance vote dilution.  *See United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1536-37 (11th Cir. 1984) (district court erred in holding that the requirement that candidates run for numbered posts was neutral); *McMillan*, 748 F.2d at 1044 (the county's majority-vote requirement for the primary, the requirement that candidates run for numbered posts, and the large population and geographical size of the county all worked together to "enhance the problems faced by blacks seeking access to the political process").  As explained by the court in *United States v. Osceola County, Florida*, 475 F. Supp. 2d 1220, 1234 (M.D. Fla. 2006), "If all five commissioners were to run at once, however, without numbered posts, a minority group such as [African-Americans] could all vote cohesively for a single candidate and if the non-[African-Americans] split their votes among

various candidates, the minority would have a reasonable chance to elect its preferred candidate."

Additionally, the Court has held that residency requirements may favor a finding of vote dilution. Such requirements have the effect of increasing vote dilution because where "each council member [is] required to live in a separate district but with voting still at large" such a requirement "—just like numbered posts—separates one contest into a number of individual contests." *City of Rome*, 446 U.S. at 185 n.21.

Here, the County uses staggered terms, numbered posts and residency requirements in its BOC elections. By virtue of dividing the election of commissioners into individual elections, these devices increase vote dilution. However, they do not each independently add weight to a finding of vote dilution. *Cf. Dallas Cnty. Comm'n*, 739 F. Supp. 2d. at 1537 ("[T]he existence of a residency requirement does not, by itself, provide probative evidence on the question of dilution when the election structure, through another mechanism such as numbered posts, already provides for the separation of one contest (e.g., election of county commissioners) into several contests."). Regardless of which method of separating elections into

separate contests is considered, the County's method of electing

commissioners through separate contests plainly favors vote dilution.

Adding further weight to a finding of vote dilution is the County's

majority-vote requirement.  To win a seat on either the BOE or BOC, a

candidate must receive a majority of the votes.  If no candidate receives a

majority, there is a run-off election between the two candidates receiving

the highest number of votes.  In *City of Rome*, 446 U.S. at 183-84, the

Supreme Court explained how this requirement works to dilute the votes of

African-Americans:

> The District Court recognized that, under the preexisting
> plurality-win system, a Negro candidate would have a fair
> opportunity to be elected by a plurality of the vote if white
> citizens split their votes among several white candidates and
> Negroes engage in "single-shot voting" in his favor.  The 1966
> change to the majority vote/runoff election scheme significantly
> decreased the opportunity for such a Negro candidate since,
> even if he gained a plurality of votes in the general election, he
> would still have to face the runner-up white candidate in a
> head-to-head runoff election in which, given bloc voting by race
> and a white majority, he would be at a severe disadvantage.

(internal punctuation and citation omitted); *see also Clements*, 986 F.2d at

749 (5th Cir. 1993) ("Majority vote requirements can obstruct the election

of minority candidates by giving white voting majorities a 'second shot' at

minority candidates who have only mustered a plurality of the votes in the

first election."); *Dallas Cnty. Comm'n*, 739 F.2d at 1536-37; *McMillan*, 748 F.2d at 1044; *Lodge v. Buxton*, 639 F.2d 1358, 1380 (5th Cir. 1981)[26]. "There can be little doubt that the majority system tends to strengthen the ability of the majority to submerge a racial minority in a multi-member district." *Jordan v. City of Greenwood, Miss.*, 599 F. Supp. 397, 402 (5th Cir. 1984).  Thus, the County's majority-vote requirement enhances the opportunity for discrimination in BOE and BOC elections.

As explained by the court in *Dillard v. Town of Louisville*, 730 F. Supp. 1546, 1548 (M.D. Ala. 1990), "When the community suffers from racial polarization in voting—and especially when the system is supplemented by mechanisms such as majority vote requirement laws, anti-single shot voting laws, and numbered place laws—at-large systems can be potent tools for those seeking to deny minorities participation in the community's political operation."  Because Fayette County employs multiple devices in its BOE and BOC elections that enhance the potential for vote dilution, this factor weighs heavily in favor of Plaintiffs.

---

[26] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit.  *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009).

### 4.    Candidate-Slating Process

There is no candidate-slating process in Fayette County.

### 5.    Effects of Past Discrimination

This factor regards "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37.  The Eleventh Circuit has often considered this factor in conjunction with the lingering effects of discrimination, explaining that "[p]ast discrimination may also lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs." *Marengo Cnty. Comm'rs*, 731 F.2d at 1567.

Plaintiffs offer no evidence regarding this factor.  Pointing to Cooper's statements that "[b]oth African-Americans and the non-Hispanic white population in [Fayetteville and Tyrone] and really the whole county are very well off" and "African-Americans in Fayette County are not that distinctively different from their white counterparts," as well as Plaintiffs' admitting that the County has a "good academic reputation," the County Defendants contend that this factor "heavily favors" them.  But the County

Defendants have not shown that African-Americans enjoy the same opportunities in education, employment and health as whites in Fayette County.  They offer no statistical data comparing African-Americans' status with whites, and Cooper's vague statement that "African-Americans are not that distinctively different from their white counterparts" does not indicate his basis for comparison or what he considers to be "distinctively different." Thus, although this factor weighs against a finding of vote dilution because Plaintiffs have offered no evidence, Defendants have not produced evidence showing that the factor weighs heavily in their favor either.

### 6.    Racial Appeals in Campaigns

Plaintiffs argue that campaigns in Fayette County are characterized by overt or subtle racial appeals.  In support of their argument, they contend that (1) comments by Commissioner Robert Horgan, and (2) "references to not wanting to be like" surrounding counties, are racially charged.

First, Plaintiffs point to the statement of Horgan, who won the 2006 special election BOC seat, that he ran for the BOC to "maintain and preserve the heritage we have in our county."  The County Defendants maintain that Horgan's comments, which were made in the context of a

newspaper article,[27] referred to the rural, neighborly character of the county as opposed to being a metropolitan Atlanta county and related to the traditions of the county and had no racial component.  Plaintiffs, however, relying on *Jordan v. Winter*, 604 F. Supp. 807, 813 n.8 (N.D. Miss. 1984), argue that the word "heritage" connotes Horgan's objective "to keep Fayette County the way it has always been," which is the "old boy way of operation."  In *Jordan*, the court found that a white candidate's campaign, which used the slogan "He's one of us," contained a racial appeal, especially in light of a commercial that included a panning of Confederate monuments followed by audio stating, "We cannot forget a heritage that has been sacred through generations."  Plaintiffs offer no evidence, however, other than their own understanding of the word "heritage," that Horgan's comments had a racial connotation such as those in *Jordan*.

Plaintiffs next contend that "white candidates who oppose district voting receive significant support from the white community and prevail in elections."  In support of this contention, Plaintiffs cite the sole statement

---

[27] Significantly, neither party proffered the newspaper article as evidence.  It is unclear whether the County Defendants' explanation for Horgan's comments was set forth in the actual article or whether the County Defendants offered the explanation themselves.

of Horgan that he "came out of the gate before anybody, being the one who said he wasn't for district voting." But Plaintiffs fail to offer any evidence that district voting was an issue in Horgan's campaign or that it was an issue that was racially charged.

Plaintiffs' final argument—that comments regarding surrounding counties such as Clayton, Fulton, and DeKalb Counties are racial—likewise fails to show racial appeals in campaigns. Plaintiffs fail to even identify who made such comments or when they were made. The evidence shows that according to Plaintiffs Adams and Alice Jones, such comments were made during commission meetings: one by a citizen and another by U.S. Representative Lynn Westmoreland. Plaintiffs offer no context for the comments or timeframe for when they were made, and thus they have not shown that the comments were in any way related to campaigns in Fayette County or that they were related to race. Further, the County Defendants contend that any comments regarding those counties are not related to race, but instead to traffic and governance issues.

From the evidence presented, the Court does not find that this factor weighs in favor of vote dilution.

### 7.   Election of African-Americans

Under this factor the Court considers the "extent to which members
of the minority group have been elected to public office in the jurisdiction."
*Gingles*, 478 U.S. at 37.  Significantly, no African-American has ever been
elected to the BOE or BOC.  This weighs heavily in favor of vote dilution.
*See McMillan*, 748 F.2d at 1045 (finding vote dilution where no African-
American had been elected to county commission or school board); *see also*
*Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (proof of only
racially polarized voting and absence of any elected Native-American was
sufficient to satisfy the totality-of-the-circumstances test); *Campos v. City*
*of Baytown, Tex.*, 840 F.2d 1240, 1249 (5th Cir. 1988) (totality of
circumstances supported vote dilution where "there was racially polarized
voting, that the Blacks and Hispanics suffer the lingering socio-economic
effects of past official discrimination, and that no minority has ever been
elected to the Baytown City Council."); *Large v. Freemont Cnty., Wyo.*, 709
F. Supp.2d 1176, 1221 (D. Wyo. 2010) ("The Court finds it significant that
only one Indian, Keja Whiteman, has ever been elected to the County
Commission."); *Johnson v. Halifax Cnty.*, 594 F. Supp. 161, 165-66
(E.D.N.C. 1987) ("Not one black person has been elected to the Halifax

County Board of County Commissioners in this century.").  Further, only one African-American has ever been elected to a countywide office: Magistrate Judge Floyd.  He, however, was elected as an incumbent after being appointed the bench.  Thus, Judge Floyd's election does not affect this factor's weight.  *See Gingles*, 478 U.S. at 57 (minority electoral success does not foreclose a vote dilution claim where that success can be explained by special circumstances, such as the candidate running as an incumbent); *Marengo Cnty. Comm'rs*, 731 F.2d at 1572 ("strong evidence of dilution" where no African-American had been elected to school board or county commission even though African-American had won election as county coroner); *see also Sanchez*, 97 F.3d at 1324-25 ("[E]xogenous elections— those not involving the particular office at issue—are less probative than elections involving the specific office that is the subject of the litigation.").

The County Defendants argue that by blaming African-Americans' lack of success on the at-large system, Plaintiffs are "apparently exercising the age-old logical fallacy post hoc ergo propter hoc," meaning that Plaintiffs assume casualty from temporal sequence.  In support of this proposition, the County Defendants cite the court's recognition in *Buxton*, 639 F.2d at 1362, that "[e]ven consistent defeat at the polls by a racial

minority does not, in and of itself, give rise to constitutional claims," and the court's command in *Nipper*, 39 F.3d at 1525, that a court should make a searching inquiry into whether race or politics is to blame for minority candidates' losses.  First, the quotation from *Buxton* adds nothing to the County Defendants' argument.  There, the court was merely explaining that losses alone would not secure plaintiffs' victory; but the Plaintiffs in this case have presented more than simply losses at the polls.  As to *Nipper*, the Eleventh Circuit explained that "[i]t is only upon concluding that a minority group's failure to prevail at the polls . . . was the 'result' or 'function' of 'racial vote dilution' or 'built-in bias,' that a court may find that minority plaintiffs have suffered 'a denial or abridgement of the right . . . to vote on account of race or color."  *Nipper*, 39 F.3d at 1525 (quoting *Clements*, 999 F.2d at 853-54).  However, the court went on to explain:

> It is a difficult task to articulate a standard for vote dilution cases that does not raise insurmountable hurdles for section 2 plaintiffs while at the same time avoiding the equally forbidden result of guaranteeing a right of proportional representation.  We submit, however, that the burden allocation detailed above strikes the appropriate balance, such that plaintiffs to make out a case of vote dilution are not required to prove the negative; rather, proof of the second and third *Gingles* factors will ordinarily create a sufficient inference that racial bias is at work.  In many cases, "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting."  The standard we articulate today simply

> allows a defendant to rebut proof of vote dilution by showing
> that losses by minority-preferred candidates are attributable to
> non-racial causes.

*Id.* (internal citations omitted).  Thus, because Plaintiffs have proved the *Gingles* factors, it is up to the County Defendants to rebut Plaintiffs' proof of vote dilution.

The County Defendants attempt to do so in two ways.  First, they argue that various African-American candidates have lost for reasons other than race.  According to the County Defendants, Wilkerson's defeat was because he has run from "too many political parties"; Simmons's "trumpeting" of his experience in Detroit was politically unpopular in the county; Hughes did not campaign for office when he ran;[28] and Rousseau did not show up to events during his campaign.[29]  In support of these generalizations, the County Defendants rely on Commissioners Brown's and Horgan's own assessments of the African-American candidates'

---

[28] Notably, in *McMillan*, 748 F.2d at 1043, the court explained that "the failure of the blacks to solicit white votes may be caused by the effects of past discrimination . . . ." (citing *Dallas Cnty. Comm'n,* 739 F.2d at 1536; *Marengo Cnty. Comm'rs,* 731 F.2d at 1567).

[29] This method of attacking Plaintiffs' evidence of racial bloc voting is unpersuasive.  If defendants could elude a § 2 violation simply by proffering such explanations, proving racial bloc voting would be nearly impossible for § 2 plaintiffs because defendants could always point to some innocent explanation for the losing candidates' loss, i.e., it would essentially require plaintiffs to prove what they are not required to prove: racial animus.

defeats. But even assuming that Brown and Horgan had personal knowledge of the African-American candidates' activities and had a basis for knowing how voters reacted to those activities, such evidence goes towards only four of the twelve[30] African-American candidates who have unsuccessfully run for seats on the BOE or BOC. Thus, this evidence is not sufficient to rebut Plaintiffs' evidence of racially polarized voting.

The County Defendants also contend that "Plaintiffs have not shown that the lack of electoral success is due to the race of the candidates who ran or even that white voters refuse to vote for black candidates" and that "in fact, the undisputed testimony shows just the opposite." In support of their argument, the County Defendants point to the fact that in the 2006 BOC special election, the four African-American candidates received 49% of the county's vote. But Plaintiffs are not required to prove that their lack of electoral success is caused by their race: "proof of the second and third *Gingles* factors will ordinarily create a sufficient inference that racial

---

[30] The number of African-Americans to run for BOE and BOC seats is undoubtedly low. The County Defendants contend that "no minority candidate has even run for commission in the past six years, even though several commissioners believe that a qualified African-American candidate would stand a very good chance of being elected." While the County Defendants equate a failure to run with African-Americans' lack of representation, the Eleventh Circuit has held that "the lack of black candidates is a likely result of a racially discriminatory system." *McMillan*, 748 F.2d at 1045.

bias is at work." *Nipper*, 39 F.3d at 1525; *see also Clements*, 999 F.2d at 860 ("Requiring plaintiffs affirmatively to establish that white voters' rejection of minority-preferred candidates was motivated by racial animus would make racial bloc voting both difficult and, considering the additional analysis that would be needed, expensive to establish.").  The African-American candidates' ability to garner 49% of the votes in a single election does not rebut this presumption.  First, even if one of the African-American candidates had won the election, that would not necessarily negate Plaintiffs' vote-dilution claim.  *See Gingles*, 478 U.S. at 78 ("[P]roof that some minority candidates have been elected does not foreclose a § 2 claim."); *Clark*, 88 F.3d at 1397 ("[T]he election of a few minority candidates does not necessarily foreclose the possibility of dilution of the black vote.") (citation omitted).  Second, while "consistent electoral success" of an African-American candidate might weigh against a finding of dilution, s*ee, e.g.*, *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1231 (11th Cir. 2000), no African-American candidate has ever been elected to the BOE or BOC in Fayette County.  This factor, therefore, weighs strongly in favor of vote dilution.

8.    Responsiveness of Commissioners to African-
Americans' Particularized Needs

In considering responsiveness, the Court must be cognizant of the

fact that this factor is of limited importance in this case for two reasons.

*Marengo Cnty. Comm'rs*, 731 F.2d at 1572.  "First, section 2 protects the

access of minorities not simply to the fruits of government but to

participation in the process itself.  Accordingly, evidence that officials meet

the functional needs of minority citizens does not overcome evidence that

the minorities are excluded from political participation." *Id.*  "Second,

responsiveness is a highly subjective matter, and this subjectivity is at odds

with the emphasis of section 2 on objective factors." *Id.*  According to the

Senate Report, "defendants' proof of some responsiveness would not negate

plaintiff's showing by other, more objective factors enumerated here that

minority voters nevertheless were shut out of equal access to the political

process." *Id.*  Thus, "although a showing of unresponsiveness might have

some probative value a showing of responsiveness would have very little."

*Id.*

With this standard in mind the Court turns to Plaintiffs' arguments

regarding this factor.  Plaintiffs contend that the BOC has been non-

responsive to their particularized needs in three ways: (1) failing to adopt

district voting, (2) ignoring requests for services such as community centers for youth and the elderly, and (3) failing to "introduce[e] or approv[e] on its own accord a Black history and heritage month."

Plaintiffs argue that at least since 1993 County residents have passionately advocated for district voting at commission meetings, yet the BOC has not conducted a survey or commission to consider the merits of district voting. The County Defendants respond that Plaintiffs have not shown that African-American voters unanimously support district voting, or even that a majority does. They further contend that public officials obviously cannot meet every request by every voter and that voters routinely make hundreds of requests, such as cutting taxes in half.

The evidence is that no less than nine individuals have advocated for district voting at BOC meetings, including Plaintiff Alice Jones, who introduced a resolution for adopting district voting. As described in Jones's resolution, the crux of the resolution was ensuring adequate representation for the African-American community. The County Defendants' evidence is that certain board members have "studied" the issue and considered Plaintiffs' positions but simply did not agree with them. Although at-large voting systems are not per se unconstitutional, *Gingles*, 478 U.S. at 48, the

71

Court agrees with Plaintiffs that citizens voicing concerns over the constitutionality of the County's voting structure and expressing feelings of disenfranchisement is different from trivial requests such as "cutting taxes in half" and therefore merits greater consideration than that given by the County Defendants.

More importantly, the evidence is that the BOC is not politically responsive to African-American voters.  As explained in *Marengo County Commissioners*, 731 F.2d at 1573, "The best evidence of [the commission's political responsiveness] is the racially polarized voting patterns. Responsiveness is an inherently subjective factor and the best judges are the people themselves."  It follows then that "[t]he continuing pattern of polarization is [] strong evidence that the elected officials are not meeting the political needs of [Fayette] County blacks."  *Id.* (citing *NAACP v. Gadsden Cnty. Sch. Bd.,* 691 F.2d 978, 983 (11th Cir. 1982)).

As to Plaintiffs' second and third bases, Plaintiffs have not shown a lack of responsiveness in the BOC's consideration of various community concerns or adopting a proclamation to celebrate Black History Month. Plaintiffs argue that the BOC has responded slowly to requests for services, including community centers for youth and the elderly, and that residents

72

in North Fayette experience disparate treatment in the areas of street improvements, maintenance and care for potholes and lawn mowing, lack of recreation facilities, and the underdevelopment of Kenwood Park.  The County Defendants' evidence, however, is that residents often contact the wrong department regarding complaints; the BOC is not allowed to cut the grass on the medians of state roads; the County has made some improvements to Kenwood Park despite its severely limited funds and its freeze on funds allocated to the park, which is a result of the 2008 economic downturn; and that the BOC thoroughly investigated and was considering a plan to build a YMCA, but abandoned the idea in 2008 when tax revenues fell following the economic collapse.  *See Jones v. City of Lubbock*, 727 F.2d 364, 382 (5th Cir. 1984) (plaintiffs did not establish a significant lack of responsiveness where "city officials ha[d] acted on a number of projects of special interest to Lubbock's black and Mexican-American communities, albeit perhaps without the speed or degree of willingness that the minority communities desired.").

As for Black History Month, the BOC adopts proclamations when they are presented by citizens and has adopted proclamations celebrating Dr. King's birthday several times.  Additionally, Dr. King's birthday is a

County holiday and is celebrated by a parade in Fayetteville; the County library, which is funded by and reports to the Commission, sponsors a multicultural program on Dr. King's birthday and recognizes Black History Month.

This factor therefore adds limited weight to Plaintiffs' claim.

### 9.   Tenuousness of Policy

As the final factor specifically identified in the Senate Report, the court must consider whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.  Although a strong state policy in favor of at-large elections is less important under the results test, a tenuous explanation for at-large elections is circumstantial evidence that the system is motivated by discriminatory purposes and has a discriminatory result.  *McMillan*, 748 F.2d at 1045 (citing *Marengo Cnty. Comm'rs,* 731 F.2d at 1571).

Plaintiffs contend that the County Defendants' rationale for maintaining its at-large system—that it ensures a county-wide constituency, whereas district voting engenders commissioners fighting over resources— is tenuous when weighed against the fact that no African-American has ever

been elected to the BOC and the at-large scheme enables the countywide majority to control issues to the detriment of the minority community. But as explained in *Askew v. Rome*, 127 F.3d 1355, 1387 (11th Cir. 1997), an "electoral system [that] is grounded in the belief that at-large elections produce candidates that are responsive to the whole electorate, rather than a geographical faction," especially when tempered by residency requirements that ensure that the governing body is familiar with all areas of the county, are not tenuous. While a commission's claim that the at-large system is preferable because it makes the commission responsive to the needs of the whole county may be found tenuous where plaintiffs show that the "residence district of each commissioner is more or less regarded as the district of that commissioner for which he has responsibility and for whose needs he is the particular advocate on the commission," *McMillan*, 748 F.2d at 1045, Plaintiffs here have made no such showing. Thus, this factor does not weigh in their favor.

### 10.    Other Factor

The Court made clear in *Gingles*, 478 U.S. at 45, that the Senate factors do not constitute an exhaustive list of considerations and "other factors may also be relevant and may be considered." The Court therefore

considers Plaintiffs' contention that the BOC discourages African-American individuals from applying for appointments by failing to regularly publicize these positions and instead basing appointments on personal relationships and nepotism.[31]  The County Defendants respond that (1) Plaintiffs offer no evidence regarding the BOC's record of appointments, such as how many appointments have come available and how many were filled by African-Americans, and (2) the lack of appointment of African-Americans is due to a lack of interest.  The Court addresses the County Defendants' arguments in turn.

Courts have found that a county's failure to appoint members of a minority group to boards, committees or commissions is relevant to the totality-of-the-circumstances analysis.  *See Buxton*, 639 F.2d at 1379 (lack of access to the political process evidenced by "the County Commissioners' failure to appoint Blacks to local governmental committees, in meaningful numbers"); *Windy Boy*, 647 F. Supp. at 1022 ("The evidence demonstrated a strong desire on the part of some white citizens to keep Indians out of Big Horn County government.  Indians for the most part have not been hired as

---

[31] Plaintiffs raised this argument in their discussion of the seventh factor. However, the Court finds it more appropriate to analyze it separately.

public employees and have not been considered for appointments to boards and commissions.").

The Court agrees with the County Defendants that evidence of how many positions have come available and how many were filled by African-Americans would be helpful. However, the Court also agrees that the BOC's failure to post open positions and policy of "just picking some people it knows" negatively impacts African-Americans' ability to serve on various boards and commissions. The County Defendants argue that individuals who want to be appointed should pursue such appointments as they would pursue employment by "meeting with individual commissioners to discuss the opportunities." The problem with the County Defendants' argument is that if individuals have no way of knowing whether any opportunities are available and what those opportunities are, they have no way of knowing whether they might be interested in an opportunity so as to approach a commissioner regarding an appointment. Further, it is conceivable that African-Americans' failure to pursue board and committee positions is a result of their lack of representation on the BOC. *Cf. Marengo Cnty. Comm'rs*, 731 F.2d at 1568 (rejecting district court's blaming African-Americans' "apathy" for low voter turn-out and explaining that depressed

level of political participation resulted from history of discrimination).

Thus, the BOC's method of appointing board and commission positions has

the potential to affect African-Americans' participation in the political

process in Fayette County.

### 11.   Aggregation of the Factors

"No formula for aggregating the factors applies in every case."

*Marengo Cnty. Comm'rs*, 731 F.2d at 1574.  "Instead, a court gradually

draws together a picture of the challenged electoral scheme and the

political process in which it operates by accumulating pieces of

circumstantial evidence.  Like a Seurat painting, a portrait of the challenged

scheme emerges against the background of the voting community."

*Nipper*, 39 F.3d at 1527.

While this standard is somewhat amorphous, courts have set forth

clear guidance regarding the weight of certain factors.  "[T]he most

important Senate Report factors bearing on § 2 challenges to multimember

districts are the 'extent to which minority group members have been elected

to public office in the jurisdiction' and the 'extent to which voting in the

elections of the state or political subdivision is racially polarized.'"  *Gingles*,

478 U.S. at 51 n.15.  Indeed, courts have found vote dilution based solely on

the existence of these two factors.  *See Bone Shirt*, 461 F.3d at 1022;

*Gadsden Cnty.,* 691 F.2d at 982-83; Note, *The Constitutional Significance*

*of the Discriminatory Effects of At-Large Elections,* 91 YALE L.J. 974, 998

(1982).  Further, the Eleventh Circuit has held that "the most important

Senate Factor is the extent to which blacks have been elected to public

office."  *SCLC*, 56 F.3d at 1315 n.4.  The other factors "are supportive of,

but *not essential to,* a minority voter's claim."  *Gingles*, 478 U.S. at 51;

*accord Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1555

(11th Cir. 1987).

Here, it is undisputed that no African-American has ever been elected

to the BOC or BOE and that voting in Fayette County is racially polarized in

BOC and BOE elections.  Based on the heavy weight of those two factors

along with the other factors identified above that weigh in Plaintiffs' favor,

and having conducted a "searching practical evaluation of the 'past and

present reality'" of the challenged electoral scheme, *Gingles*, 478 U.S. at 45,

the Court finds that the "dots" of circumstantial evidence, *Nipper*, 39 F.3d

at 1527, form together to show that African-Americans "have less

opportunity than other members of the electorate to participate in the

political process and to elect representatives of their choice," 42 U.S.C.

§ 1973(b).  Thus, the Court is satisfied that "under the totality of the circumstances, [African-Americans in Fayette County are] denied meaningful access to the political process on account of race or color." *Nipper*, 39 F.3d at 1524.

Because Plaintiffs have satisfied all three *Gingles* preconditions as well as the totality of the circumstances test, the Court will grant summary judgment in Plaintiffs' favor on their claim of vote dilution, and deny the County Defendants' motion for summary judgment.

## IV.    Conclusion

For the reasons set forth above, the Court finds that Plaintiffs have shown vote dilution and therefore GRANTS Plaintiffs' motion for summary judgment [110] and DENIES the County Defendants' motion for summary judgment [108].[32]  Based on the Court's holding and the BOE Defendants' admission of liability, the Court ORDERS the parties to submit proposed remedial plans for the BOC and BOE elections, in accordance with this Order, on or before June 25, 2013.

---

[32] The parties' motions to file excess pages [139 & 143] are granted.

IT IS SO ORDERED this 21st day of May, 2013.

Timothy C. Batten, Sr.
United States District Judge